Good morning, Your Honors. Good morning. Good morning. Last Friday, we received an e-mail saying May we enter your appearance? Excuse me. I'm Chinatana for the appellate district. I apologize. But I am curious about your response to the order. Yes. I think you can pull that up a little bit. Okay. So you won't have to reach there. Sorry. My first question is, does that count against my 15 minutes that I'm allotted? Oh, start them over at 15. No, I mean, the question about standing. Yeah, that's part of your 15 minutes. Because if you don't have standing, you don't need the rest of the time. The clock is running. Does your client have standing? Yes, Your Honor. Why? For a couple of reasons. You know, the Fawn Dealer case, the court announced a test to have standing. The appellant must show he was directly and adversely affected pecuniarily by the order of the bankruptcy court. Mr. Clyde was the shareholder of the debtor. And the asset that the trustee sold was the last remaining asset. At the time of the sale, the estate, in effect, owed no more money to the creditor. The creditor had obtained a windfall by obtaining at a sheriff's sale for $200,000 an asset of the debtor. Counsel? Yes, Your Honor. That argument that you're making now, if this is a quitclaim deed and if your client owns the property, how does that affect your client if he really owns the property? Doesn't he still own it if the transfer was by some kind of a quitclaim conveyance? Well, the transfer was not to the client. The transfer was to the creditor. No, but if the transfer was not made with some kind of warranty or guarantee that is absolute, that's like I would say like fee simple in a land title basis, and it doesn't affect the interest that your client would have because it's a quitclaim conveyance, your client doesn't lose any interest in that property, does he? He still, if he's got it, he still owns it because the debtor corporation, when they gave that quitclaim, the trustee gave that quitclaim deed, didn't pass anything that it didn't own. Well, Your Honor, the answer is that the trustee did not sell, sold the asset as a quitclaim under the Pop case, as a quitclaim under the Pop case to a third party. So if the court in the … But the third party takes it subject to ownership, when they accept it as a quitclaim, they're not getting any kind of warranty. Well, that's true, Your Honor, but the point is that the bankruptcy law doesn't allow the trustee to sell something it doesn't own. And in a case in which the trustee sells a quitclaim, it really is selling something that it may not own. So what? How's that a problem for the estate and for your client as a … Mr. Quye. Well, we're talking about the standing issue, and the Pop case really addresses the merits of the appeal. So we can talk about the Pop case if we want, but getting back to Von Diller, I was saying that the shareholder here, the appellant, Mr. Quye, lost his … the remaining asset with this sale by the trustee. This estate appears to be so far underwater that it doesn't matter. And the point of the standing question is that somebody in the position of your client has to show there'd be something left over. Your Honor, that assumes, that assumes that the sale of the last remaining asset of the estate was proper. If the sale … But you told us that the estate didn't own it anyway, so how could the estate be shorted as a result? We're talking, Your Honor, we're talking, Your Honor, about the sale of Starbo. And there's a question whether … we didn't raise it, we didn't raise it, but the creditor raised it in the court below. And the buyer knew about this. So on that issue alone, I mean, there's a question of good faith or bad faith. But we've expressed finding by the bankruptcy judge that this was a good … That wasn't based on any evidence.  It was based on Judge Montali's observation that the liabilities of the debtor so far exceeded the assets that Mr. Quye couldn't show as a shareholder that he had any value left because the estate was valueless. Therefore, whatever it was that the trustee conveyed, which got some money for the estate, not much, but some, was in essence a good faith act by the trustee. Your Honor, that goes to the question of the failure of the bankruptcy judge to require the trustee to do due diligence on the value of the asset. Your client wasn't prepared to offer a million dollars or more, which is what the bankruptcy judge said would be needed in order to bring this underwater corporation debtor solving, right? Your Honor, that assumes that the corporation was underwater. After the creditor acquired the first asset, which the debtor had valued at over $5 million at the sheriff's deal for $200,000, in effect, the windfall gain, that was a windfall gain for the creditor. But let me ask you a different question. Whatever happened in the San Francisco Superior Court litigation? The San Francisco Superior Court litigation is not yet over. The court bifurcated the case. The first part of the case had to do with whether or not the election of the new officers at Burlingame Investment Barbados was proper, and the court tentatively found that the election was not proper. And trial on the damages cause of action is set for June of this year. So getting back to the question of peculiarly and adversely affected, Your Honor, if the trustee did her job to look after the estate after the creditor acquired the first asset, which the debtor had valued at over $5 million, essentially the creditor got more than paid what it was owed under the judgment. And it's bankruptcy jurisprudence that a creditor is not entitled to get paid more than it's owed. So essentially the shareholder here, Mr. Kwei, lost the last remaining asset of the company. Maybe I'm misunderstanding here, but if the stock, if it was valued at over $5 million and the sheriff's sale, which I assume was of, what was it, the judgment for attorney's fees? Yes, Your Honor. Sold for only $200,000. Right. What's left? What's left is a stock in Starville which represents 50 percent ownership of the parent company of the creditor, in effect 45 percent of the creditor. But I'm looking for some other tangible asset besides, what was it, a $1.5 million judgment that sold for $200,000. We have the shares in Starville, Your Honor. But that doesn't tell me what they're worth. I mean, so I don't know anything about this other entity. What is it? What assets does it have? The asset it had was 50 percent shareholding in the parent company of the creditor. Mr. Taney, I mean, this is a shell game and I'm trying to find the pea under the pod here. Tell me something tangible other than all these entities that have stock in each other. Starville. Explain value. What is the value that you're talking about in these entities? Not that the entities exist, but how do you value them this way? The point about the Fitzgerald case, which is the major reason to reverse the decision of the bankruptcy court below, says that the bankruptcy court has to do due diligence to determine the value of an asset before it's sold. What is it that the trustees should have investigated in conducting such a due diligence investigation? The trustees should have. In fact, the interested parties here offer to do the due diligence, to do an investigation of the financial condition of this chain of companies, at the end of which there's a company that had developed 700 lots and was selling lots for over $300,000. It's an ongoing business. What's that entity? Excuse me? What's that entity? That's a company called Quail Lake. And Starville, in effect, owned about indirectly 34% of that company through the chain. The parent company owned the creditor, and going down the chain, at the end, there's the only operating entity that's generating money. And where is this real estate located? In Fresno, California, Your Honor. Right. Counsel, the property that's at issue that was sold was sold for $20,000. Yes. And what is your contention as to the value of that property that was sold? Our contention, the debtor's contention, was that the value of that property was over $4.7 million. All right. And you were given two months to pay or come up with an offer of more than $20,000 for this multimillion-dollar property, and you couldn't find another buyer or you couldn't purchase it yourself for more than the $20,000? Couldn't come up with $20,000 for a $5 million, for something you're telling us was worth $5 million? Your Honor, we didn't find out about it. I personally didn't find out about the sale until it wasn't two weeks. There was a hearing set, and then we had to scramble around to submit our documents showing that we were interested parties. And our position is that that property, which the debtor and Mr. Kwai claimed valued at over $5 million, should not have been sold at all. What evidence is there that there was actual value there? I mean, nobody offered more than $20-some-thousand. What evidence is there that should cause anybody, including the trustee, to go to the effort of finding that it's worth $5 million? Well, Your Honor, if the trustee had done her job. What evidence is there that gives any suggestion that the value is there? There is no evidence in the record below, but there is evidence of financial records, statement of Quayle Lake in 1998 that showed that Starbull's, not Starbull, but the debtor's subsidiary that got acquired for $200,000, had a 5% interest in the company. And that 5% in the audited financial statement, Price Waterhouse financial statement, in 1998, Your Honor, not 2010 and 2012, was worth $1 million. That's 5%. If you say 5% is worth $1 million. The only evidence which is not in the record, apparently, is a 12-year-old financial statement suggesting there's value in real property. Well, Your Honor, that's the point of the Fitzgerald case. The bankruptcy judge in the Fitzgerald case says that before an asset like this can be sold, the bankruptcy court itself has to do independent research on what it's worth. And that wasn't done here. That goes to the merits, Your Honor. I want to save some time for rebuttal. You're down to two minutes. Thank you, Your Honor. Yes, I do. Okay. Let's hear from the attorney for the trustee. Mr. Mayor. May it please the Court. I'm Charles Maher of McKenna Long on behalf of the trustee, Andrea Wyrum. To address the standing issue, I think three of the issues the appellant raised can be disposed of on lack of standing ground. It all has to do with lack of pecuniary interest. The 363E argument. Mark, could you? I'm sorry. Did you catch what I already said? That there were three reasons why Kawhi has no standing. There are three issues that he's raised on which I think he can get tossed on standing grounds because of lack of a pecuniary interest. The fourth, which happens to be the first one that he raised, is a 363E adequate protection argument. That is him claiming that he has an interest that's disturbed somehow by this sale. I don't think that can get ‑‑ I'd like to get rid of it on standing grounds, but I don't think you can. So we don't have to reach it if we decide it on standing? Well, I think you do have to reach it because he's raised it. It became his primary argument, even though it wasn't raised in connection with the sale. It was raised in reconsideration for the first time. But if he has no ‑‑ I mean, I guess the bankruptcy court, as I read the record, said, I don't think he has standing because I don't see that he has any value left here. But if anybody has standing to object to the sale of this quitclaim deed, it's Mr. Quye. That's sort of what he said, and he waffled a little bit, which didn't please me, because I think they all should have been bounced on standing grounds at the first hearing. At the second go‑around, motion for reconsideration, Mr. Quye argued that he had a right to adequate protection, sort of as a lien holder might if a property were sold, that you can't say, well, we're just going to sell this property, we're not going to pay you. And so Mr. Quye was arguing he had an ownership interest, in effect, in these shares, which we disputed and we don't think there's any evidence of. But he raised it, and I don't think economic standing gets rid of it. Okay. And I take it you're not involved in the San Francisco Superior Court litigation? That's correct. I'm not. So you're saying that that argument raised in reconsideration, somehow you're agreeing, which I don't think you can agree on a question of law, but you're suggesting, therefore, he has standing? I'm suggesting that he should have, that if there is an issue that you cannot dispose of on pure economic grounds, that's it. I think that argument was waived when he didn't raise it in his objection to sale, because 60B means something. If, in fact, the quit claim didn't affect any interest that he had from the get-go, then what protection does he need from a sale that doesn't affect him? None. So if it doesn't affect him and it has no consequences to him, how can you say he has standing if that shows he has no standing? Well, that's a good point, Your Honor, although I guess I was trying to be more deferential to Mr. Quy than perhaps I need to. But I think on pure economic grounds, I don't think that claim can get rid of, be gotten rid of, but it can be gotten rid of on other grounds, and Your Honor just named one. There was a declaratory relief judgment in July in San Francisco last year, and the superior court stated that Global Reach didn't have a right to the shares. And so in retrospect, what we sold was nothing, which we thought was what we were doing. Because we told the buyer at the time, we're selling it as is, where is, with no warranties or representations. Whatever interest, if any, we have, we'll sell you for $20,000. That's correct. And it turns out the buyer spent $20,000 to buy nothing. Correct. Okay. There were a couple of points made in the reply memorandum that I did want to bring up, and that is there was an accusation of collusion, which if existed might defeat a good-faith purchaser finding. There's an accusation against me personally that a friendship that I don't really have with the creditor's lawyer led me to collude. That's just as simply incorrect. My previous dealings with that lawyer cost my firm personally money because he was representing a trustee that sued it for paraplegia. I don't mean to speak for my colleagues, but I wouldn't waste your time on that issue. I didn't read anything into that allegation. I'm finished. All right. Thank you. Any other questions? Your Honor, the question of the quick claim sale, the sale was made to an affiliate of the creditor, and the affiliate of the creditor actually transferred title to the company. So Starbull no longer is owned by the trust. But in light of the San Francisco Superior Court's ruling, as far as Mr. Kley is concerned, so what? So what? If he didn't have any interest in it, then we're back to what we started with. How does he have standing? He has an interest in the debtor, which owns Starbull. Or not. Excuse me? Or not. He has an interest in the debtor, but his interest is as a shareholder. And the debtor appears to be ridiculously underwater, so the shareholder interest is worth nothing. Your Honor, that's not correct because that assumes that the Starbull shares are worth nothing. And that was based on assertions made by the creditor. The trustee did no due diligence to investigate whether or not that assertion. You have on the one hand the debtor saying that that asset is worth over $5 million and the creditor saying it's not worth anything. If that company should, those shares should not have been sold. In fact, Mr. Kley's position is that after the creditor obtained a windfall acquiring the first asset for $200,000, it got paid off more in spades. And that last asset remained that the trustees should have dismissed the bankruptcy. And global reach should have gone back to the shareholder, and the shareholder would still have the asset. The superior court said he doesn't. Well, it's not entirely clear, Your Honor, because I haven't seen the judgment. All right. It's not before us and we're not opining. Right. But I think we understand your position. You are over time. Can I have a couple more minutes, Your Honor? Not at all. Thank you very much. Thank you. All right.
judges: Benavides, Tallman, Clifton